Mr. Jakes. Good morning. May it please the Court, I'd like to focus my attention this is central to this case. It's a straightforward claim construction issue. There's no dispute here about the term continuous process limiting the claims. The question is, what does continuous process mean? The proposed construction and the one adopted by the Court was simply a film produced by a process that continuously casts, for example, by an endless belter drum. And we say that's not enough. The specification, the prosecution history, the entire record also requires this step D1 as part of a continuous process to meet what is required in the patent. And you don't think that the fairly high standard, let's just call it the thorner standard of because, you know, there are sort of two different ways of looking at it. One is you look at the entire specification and you have to interpret the term continuous process. Right, but I guess, just tell me why this is wrong. I guess, at least in my mind, I have been thinking of thorner as applying in those situations where when you look at the word of the claim, you're not really seeing any meaningful wiggle room, any ambiguity and nevertheless, that plain meaning can be overcome, whereas you don't need the special thorner standard to make quite substantial use of the spec when there is, in fact, an uncertainty in the language itself. If that's right, where's the uncertainty in the language continuous? Sure. First of all, if we have to meet that higher standard, I think we can meet the standard of disclaimer here. But again, I don't think we need to. The term continuous process, if you just look at the words by themselves out of the context of the patent, well, it could mean a lot of different things. So it has to be interpreted in the context of the patent. And the specification provides the meaning. If you just look at the naked words continuous process, it could mean pretty much anything. But we already have the court saying, well, it is limiting on the claims and it is a process that continuously casts. Those words are not in the claim. For example, by an endless belt or a drum, those words are not in the claim. So we're doing claim construction here and interpreting these words. And when you look at the entire specification, it requires D1 because otherwise, the rest of the statements in the specification have no meaning. Repeatedly... Wait, why would that be so? Why couldn't, at least, and the real heart of this is Column 20, Column 21. It is, yes. Why couldn't that be an embodiment rather than the fully exhaust the range of... Sure. Well, first of all, in places leading up to that, it uses the term the present invention and says this step is important to produce the film that's required. There are sprinkled in there a couple of times the word preferably or for example. And I think probably the statement you're looking at is where the specification says there can be variations. Well, you look at the examples. What are the variations? They are not in step D1. Every single example, all seven of them have step D1. That's not one of the variations. The variations are in temperature and some of the conditions. Specification says it's important to the present invention to have that step. So the variations and in the process, they don't relate to that particular step. Every one. And it's your view that, what's the language? Comparative example? The comparative example, yes. That's not actually part of the invention. That is rather something you're comparing the invention to that... Yes, that's very clear from where it says the results of comparative example one are unsatisfactory. It says that's unsatisfactory. It doesn't have the dimensional stability that's necessary for the invention. Now, there may be some of the properties that fall within the claims, but it's not made by step D1 and it's therefore unsatisfactory. In fact... Mr. Jakes, this was a jury verdict and the issues that you're arguing to us were presented to the jury. So we need to... Were they not? No, Your Honor. It's a matter of plain construction. This construction was given to the jury that all that is required by continuous process... And apparently, without objection, the construction was presented as the parties agreed. Is that right? No, that's not... We did not object at the time of summary judgment stage that the court was going to use this construction and we did not agree with it. And I think if you look at cases like cardiac pacemakers versus St. Jude, we don't have to repeat that objection to preserve this issue for appeal. That the incorrect construction was given to the jury and it makes a difference because if you see from the summary judgment papers, it's undisputed that SKPI's process does not use step D1. So it's not a harmless error. This claim construction is meaningful. If the court had given the correct construction, that it required step D1, that it requires a SAG when the film goes into the tenter, we wouldn't have met it. Do I understand right that on this claim construction issue, you have requested vacator, not reversal? Well, reversal of the claim construction and remand the case. Well, what would be there... What would there be to remand for the 961 judgment? Wouldn't that just be reversed? Or is there actually a dispute about whether under your view of the claim construction, there could be infringement? I don't believe there is a dispute. We did not move for judgment as a matter of law on this issue. And so I believe that the correct process would be to vacate the judgment and what happens on remand would be determined by the district court. We didn't want to over ask for what we were entitled to. If you look at the prosecution history, that also confirms this particular construction. Throughout the prosecution history, it says that this continuous process results in a materially different product. And for example, the Fujihara reference is distinguished saying, if you don't use this step, you would inherently get something that's not within the claims. So that can't be comparative example one either. There is a statement in there that says the claims are directed to the film, not the process. But this case is already established that produced by a continuous process is a limitation in the claims. The court said that. Conaca proposed that. We're just talking about what does that mean and how does it limit the claims. And once you look at all the documents, including the specification and the prosecution history, I believe that it should be interpreted to require step D1. And Judge Toronto, to your question, if we have to reach the level of the Luminera case or the Polyamerica case, very similar language in the specification about the present invention. And I think in Luminera, the term free to pivot was interpreted as requiring chaotic movement based on the statements in the specification. That's very similar to what we have here. The repeated times where it says the present invention and this step is important, make it clear that that's what it should be. Also, if you look at the examples, the seven examples, every one of them says the present invention. Every one of them has step D1. The comparative example does not, and that's rated as unsatisfactory by the specification. Okay, if I could turn to the inducement issue on the 9-6-1 patent. Here, what the district court said, it said that SKPI was aware of the patent when the suit was filed and continued to use the same process without change. That's not enough for inducement. There has to be an intent to infringe. In fact, if that were all that were in a complaint, it would be dismissed on the pleadings. That's not enough even at the pleading stage to plead inducement, to simply say, as of the date of filing the complaint, you were aware of it and you didn't change. So what else is there? Can I just ask, so this is a case in which the AIA's 298 does not apply, right? It does not. So if 298 doesn't apply, is there some pre-298 law on the subject of whether not having gone and gotten an opinion of counsel or the like can be used against you? I don't think so. I mean, I think before the statute was amended, that was generally the law that you couldn't use the failure to invoke privilege. I mean, invoking privilege is something against you. There isn't any issue like that here. There's no question about any of that. It wasn't part of the evidence, in fact, used to support the inference of knowledge of infringement or willful blindness toward the possibility of infringement that you didn't go out in the months following July 2010 and try to figure out whether you were really infringing. Well, I know I don't think that's a fair inference and I think that's really the answer is because what happened after the suit was filed? Well, the district court suit was stayed and there was a case that went forward in the ITC. Right, but there is at least some evidence that maybe the product was not quite the right product, so that can't be conclusive. Well, we had a determination by the ITC that we didn't infringe and Kanika can complain after the fact saying, well, there might have been something wrong with the samples. The fact is there was a determination that we did not infringe. They didn't appeal it. They did not appeal that judgment. I don't think it takes a great leap to conclude that SKPI from that believed that they weren't infringing. The idea that somehow from a judgment from the ITC, you don't infringe, that they would conclude, oh yes, we're likely we still do infringe, that doesn't even rise to the level of what a reasonable jury would conclude. And that can't be enough. In fact, it shows the opposite, that SKPI throughout believed that it didn't infringe. In the normal course of the litigation, it presented its non-infringement defenses and it succeeded. So where is the intent? The only other thing is the other witnesses who were presented, the judge said that their testimony was not detailed. They simply said, look, we had positions in our litigation. I think your suggestion is that the criticism of those witnesses merely returns the state of the evidence to neutral. But why couldn't it, in fact, move it in the direction of support? Namely, when the witnesses put on by the defendants are essentially, I'm not assuming this characterization, are just reciting wrote stuff given to them at a high level of generality. Why isn't an adverse inference drawable from that? Because we didn't have a burden to prove our own good faith. It's their burden to prove induced infringement. And that's why we say the court, when it looked at it and properly shifted the burden, they could have said nothing. And what they did say is consistent with what Mr. Song said, we relied on the ITC determination. There's nothing inconsistent with that. This can't meet the bare threshold. I mean, that's what this court does. You have to look at the evidence that was presented and say, is that enough for a jury? And we don't think it meets the line. Do you have anything you want to say about the 069? Oh, the 064, Pat? 064, sorry. Well, on the exhaustion issue, that's a question of a law that this court should determine based on the contract. There was testimony from two witnesses that Kanika put forward, and they were not familiar with the negotiations. There's no contemporaneous testimony to change the plain words of the contract. And so we stick by our exhaustion defense and believe that that should resolve the 064. Okay. Thank you, Mr. Jakes. Mr. Dane? Good morning, Your Honors. Anthony Dane, appearing for Kanika. The 961, what SKPI is doing is trying to argue around the comparative claim by picking out of context one sentence in which the comparative claim was being compared to the other claims. But they can't deny that the comparative claim was done without Step D. Comparative example. Comparative example, I'm sorry. That's okay. Was done without Step D, and it met claims. It met the claims 1 and 5. So the comparative example is another example, another mode that met claims 1 and 5. It just didn't meet 2 and 4. So what they're doing is taking out of a context a statement, which really in context means we couldn't get the best. Let me just ask this, and I may be confused, but you'll correct my confusion. So in your view, it meets claim 1 and 5 only if you assume the answer to the question of what continuous process means. No. What I'm saying is the comparative example was done without Step D. So even if Step D were in court, let's say they want to incorporate Step D. But then it wouldn't meet claim 1, which requires a continuous process, if, in fact, continuous process required Step D. It would meet. Yeah, that's right. But here's the point. You have to construe the term across the entire claims. So each one of 1, 2, 3, 4, and 5 use continuous process. So you can't have it both ways. If what you're going to say is there is only one example, I mean, there's only one mode in the patent, and that has Step D, then you're ignoring this comparative example. And if continuous process... What's the best reason that you can point to from the spec to infer that the comparative example, which sort of sounds like it's not part of the invention from the name, is actually part of the invention? No. First of all, when you use comparative example, there's no case law that says the term comparative example means it must not be part of the claim. That's why I said sounds like. Sounds like. And that is, to narrow the plain language of the claim, a disclaimer must be clear and unmistakable. That's Sanofi. I don't know where counsel is arguing that he isn't bound by the fact that you have to disclaim that and say that they don't have to meet that burden. But nowhere in the specification does it say Step 1 is necessary or required. It merely in the best mode section says it's important. It doesn't say necessary and required. And there are claims. But it was used to distinguish the prior art, was it not? No. And that's where they're also parsing words. To distinguish a priority was not necessary. And that's where I get into to clearly disclaim that any other method other than Step D is required to meet the claims. So no, that isn't the case. And that's where you have to combine these. They can't pick and choose. There was no disclaimer that was clear and mistakable that said only Step D must be employed. And in fact, when they were arguing claim construction, if you look below, they were arguing that the comparative example didn't meet any of the claims. And when we demonstrated to the court that, in fact, it did meet, the lack of Step D still would meet in the comparative example under Claims 1 and 5. And the court said, I have to consistently construe continuous process. Can we just go through this again? I guess I'm stuck in what may be a confusion. If continuous process requires Step D, then comparative example 1 doesn't meet it, does it? No, no. But what they're saying is that they'd be ignoring the continuous process has to be construed across the entire claims, right? So you'd have to have an unmistakable disclaimer that it has to be under Step D. But then how do you, without having absolute language in the specification that the comparative example was meant to distinguish this invention and say that it does not meet this invention, how do you reconcile that it meets Claims 1 and 5? Just if you read what the patentee said is, in context, you didn't achieve the best mode. You didn't achieve the most consistent across the entire width of the expansion you wanted. But it didn't say it was required. And it didn't say that you failed to meet this invention under comparative example 1. But didn't they always release the tension as in Step D? Say it again. I'm sorry, Your Honor. I said, didn't they always release the tension in order to get the desirable structure? No. You can do it by releasing tension or without tension. You may get the best mode by Step D. But there are other modes that you could get. And that's what the court in construing the claims was understanding, that you may not get the best mode. And this was under best mode. Step D was under best mode section. All comparative example is saying you're not achieving that best mode. So how did the claim construction, as Mr. Jakes argues, embody the distinction that he states was wrong as a matter of law? Well, the continuous process was construed by the court as it was, just to be consistent across the claims. It's just a process in which you consistently pour the varnish on and it runs by a belt or a drum. That's consistent across the entire claims. In order to achieve the best mode, you may want to use SAG. But you don't need to. You can apply tension. And that's the comparative example. It just merely didn't achieve the best mode. Did the comparative example use SAG or did it have tension? No, the comparative example didn't use the Step D. That's the point. Did not. But is that fact which you just stated, is that in the description of comparative example at the bottom of column 32? Your Honor, I don't have that. I'm sorry. I don't have the column in front of me. I don't know if counsel can have it. But the comparative example... But when you say it did apply tension before it went into the tenter. Yes. Okay. And it meets, it still meets claims one and five. So let me just say this. So I guess the answer is yes. And I can cite you to the appendix 350 at 37.1 through 28. That Step D, I mean, comparative example one was made without Step D or SAG. And it falls within claims one or five. And claims one through five all claim a polyimid film produced by a continuous process. So we start with, you have to establish the common terms. They have to be construed across the entire claims consistently. And then, as I said, we didn't say that Step D was necessary. We didn't say it was required. Which is what the case law says if you want to explicitly disclaim. So they're reading into the specification things that aren't there. And they want to read into the claims against these two positions. Against the Rexnard case, which says the common term must be construed consistently. And that if you're going to narrow it, a disclaimer must be clear and unmistakable. So do you agree that there was a proper objection to the claim construction as given to the jury? Oh, no. There was no. He, the counsel admitted there was no objection at the time it was given to the jury. And in fact, they continue to argue. There was an objection during the Markman hearing. Well, the Markman hearing, I guess if you call it an objection, they were just arguing a different construction. I don't know. Have they preserved this claim construction issue? I don't recall in your red brief saying that they didn't. I didn't. I didn't argue that because. Didn't this court say, I thought it was in Verizon against Vonage or some other case? Squarely. If the claim construction issue has been resolved definitively ahead of time, you do not have to raise it at the jury instruction stage. And your honor, for purposes, I would agree with that. I don't know that they haven't preserved it by failing to object a third time. But that's critical, is it not? They're limiting their argument to this question of law. They appreciate the problems with review of a jury verdict. And so we need to decide whether the question of law was correctly decided and appropriately objected. No. And here's the problem with not objecting at that stage. It would mean that you would simply have to go back because we're not agreeing that they wouldn't infringe even if step D were the requirement. They seem to imply that this court would simply have to reverse because there's no issue that they would not infringe if they didn't meet step D. We didn't concede that. We didn't agree to that. And they didn't make a JMO motion. That's right. That's right. All we would be doing is going back to see whether the judge, in reviewing this again, would either employ step D, which, again, would require him then to be consistent across all the entire claims. But we're not agreeing that they still didn't infringe. We just believe that the court got the proper instruction. So again, yeah, they would have had to object to that and have a JMO. Saying that, you know, without step D, there would have been no infringement. Or if they didn't do step D. Your Honor, just to preserve time, could I briefly go to the 06-4? He made, Mr. Jakes made essentially two arguments this morning. The 06-4 was sort of the third right at the tail end. Oh, I'm sorry, yes. The second one was, he says, there was insufficient evidence for the jury to infer the intent requirement of inducement. Can you explain what the sufficient evidence is of knowledge of or willful blindness to infringement of the 961? OK. So first of all, once the infringement claim was filed, the infringement lawsuit was filed, they have knowledge. What Your Honor was addressing in that... They have knowledge of the patent. The patent, right. Which is not enough. Well, and again, they spent a lot of time talking about evidence of knowledge, not of evidence of their intent. Knowledge of infringement. Right. So that's what I'm getting to. Drop the word intent. That's what I'm getting to. So they had knowledge of the infringement. And what Your Honor was getting to, they hired an expert. They did hire an expert, and that expert specifically was not asked to determine whether they infringed, merely just to criticize the testing of Kanika's expert. And that alone would be willful blindness, because once you hire that expert, who's an expert on infringement, and you're saying, I don't want to know if I infringe, then you're becoming willfully blind. In addition, Your Honor is correct. Would that inference still be good after 298? I believe that inference after 298 alone would not be enough. It would be part of the evidence, but not enough. And pre-298 law allowed you to rely on that? Is that right? It did. It did. But there's more. Or is this just no... We never said the contrary. Well, clearly it's never said the contrary before that there was no right to rely on that. And I think that without a statement that counsel couldn't, it would kind of lay waste to a lot of jury trials where counsel didn't need to put on more. But there was more. They had a patent task force that had been examining patents. The patent task force was looking not just at patents, but at patent applications that they expected to issue. The patent task force had statements saying that, boy, we're running a serious risk of being sued on a number of patents. They were looking at specifically Kanika's patents because, again, there are only two or three competitors in this field. But then there was even more than that. They continued to follow the patent process afterwards. And then they did have witnesses. I'm sorry. Why would that... As soon as they were sued on July 26, 2010, they knew about the patent. Who cares whether they were following the patent? Right. If they continue to follow patents, that's where I'm getting to what Your Honor said. If they choose to present witnesses and they present persons most qualified on this issue and we depose those witnesses, we can use that evidence affirmatively to show that the jury, regurgitating, wrote statements and they're not actually clarifying why, in their opinion, as they said, their statement is, we believe we did not infringe. Well, that means you're making an effort to determine you infringe. And if your statements are merely applied as they admitted by their attorney, were given to them by their attorney, then that is evidence that can be used. And the judge did use that and the jury did use that. Your Honor, I apologize. We're running out. But will you take a few minutes on your cross appeal? I will take a few minutes. Just three minutes. Does court not wish me to address the 064? Exhaustion question. Do you have something you want to tell us about that? Merely that on the 064, counsel just made a tautology. They changed the law, even though we had two experts who had submitted reports, depositions, and declarations. And all of them disagreed on what the law is. And ultimately, the two parties of Japanese construction, the two parties stipulated to an instruction, told the judge it was based on all that. And the instruction is not the law that they're now imposing as a tautology. They're now saying their expert would have liked the law to have been this. That's what this court should follow. They've waived it because they stipulated to the instruction under the law. So for JMAL, right, we've said, and they appropriately quoted footnote five in Markman, which was directly based on the Supreme Court's boil against United Technologies, that for JMAL, the standard of what the correct law is, is not tethered to the jury instruction. That leaves the question, did they, in their JMAL motion, say, by the way, the law demands much more than was stated in the jury instruction? No, they did not do so in their JMAL or in their appellate briefs. This was a new creation. They did in their appellate briefs. Not, they stated it just as a matter of principle without backing out that once you're on appeal, having not done it in a JMAL, now you have to accept that you stipulated to a jury instruction, and now you do have the waiver issue because they didn't raise it in JMAL. That's my point. So they just stated as though they did, and then we had to argue waiver. Okay, that's it. Let's hear your cross appeal. And I'm sorry if this is a racehorse, but I'm trying to get it through so quickly. On the injunction, what happened is during the course of post-trial motions and before the court had decided, SKPI files its own declaratory judgment action, claiming it no longer infringes. Well, in that case, to get straight to the point, isn't the issue whether, in fact, we now should consider the change, whether there should be an injunction against any changed structure or await the result of the declaratory action? So there are two steps. And first, in arguing against an injunction, they admitted, and we have testimony, they admitted that they continued to sell the infringing products, the actual products found to infringe, for a period of time, at least six months, or more, after the jury's verdict. So they continued to deplete their inventory. Part of our injunction was exactly on that, to stop... I'm sorry, why is the jury verdict date the relevant time? The jury verdict... The jury verdict was six months or something before you even moved for an injunction. No, no, no, no. We moved for injunction. The court didn't issue the judgment and didn't have the hearing for a period of time. So the judgment wasn't issued for approximately 14 months, I think, after the jury verdict. But when the jury verdict was issued... The delay was because of request motions for J-Mall? In part it was, and then in part after the J-Mall motions were argued, the judge took a long period of time just to issue the judgment. It may have sat for a while, and then he realized we filed some papers indicating he hadn't yet issued it. But did the damages assessment include infringement during that period? No, and here's the problem. This is what we raised. The SKPI's position at trial was, we have no idea where a film goes, so we can't help you with damages. We don't know where it goes. We don't know how much there is. But you're asking us to decide where the film goes, or isn't this something for the district court? No, the jury had already decided it comes in the United States. The problem was we couldn't quantify the total amount. That was always the problem we had. So we narrowed it to a very specific route we could follow coming in. But our experts said, there's much more coming in, I just can't quantify it. And SKPI was of no help because they were saying, we have no idea where it goes. We have no idea. The jury didn't believe that. They knew it came in the United States, but we couldn't quantify the dollar amount. So we said we were being irreparably harmed by this continuation of selling what the jury had already found infringed. The judge ignored that. What he said was, as long as they filed a motion, I mean, a new complaint, I have to defer to that court. But, Your Honor, that turns the law on its head. So every time you get a jury verdict or a judgment, if the other side merely goes in on declaratory judgment and says we've designed around whether they have or not, we obviously believe they still infringed. It doesn't have to be any time. It's a matter of some discretion for the district court, right? No, the court didn't even get into the details of whether or not they're... I thought Judge Bernal said among the reasons for not giving the injunction was that basically this matter is in Judge Guilford's hands now and leave it there. What he said was, I don't want to interfere with that determination of whether there is a redesign. But you see... That was on the assertion that the product had been changed. But that sounds as if you're arguing us, asking us to do something or other to exclude everything, change product, unchanged product. No, this is what we asked for, to enjoin the continued sale of the actual products, the named products that were found to infringe, and any products that are not colorably different, which is a normal injunction so that you can't... And just to clarify, did you ask for all of their sales that meet those two criteria to be enjoined without regard to whether they knew that those units were going to come into the United States? No, only the products that are coming to the United States, but the jury had already found... What was the language of the proposed injunction? The language of the proposed injunction was to enjoin the products that had been named as infringing and those therefore induced... I'm sorry, you don't enjoin the product, you enjoin an activity with respect to the product. Yeah, that's right. So the making, using, selling of any of those products, and actually we'd ask for a notice that they notify their vendors that they not be ultimately products that come into the United States and any colorable imitations. So if they have products that they're selling in China, of course those wouldn't be enjoined. This is an induced... Where's the language of your proposed injunction in the appendix? Do you have the appendix number? Nope. I believe, and I could be wrong, I think it's found in appendix 7261 through 7275. That's testimony. Okay. Can I read to you the actual words? It's 7696 through 7697. And I'll read it to you, Your Honor. Directly or indirectly infringing the 961 patent by manufacturing for delivery to the United States, using, selling, offering to sell, or importing into the United States. The specific films found in Pritchett, and I didn't lay them all forward, the 961 patent or any colorable imitations of the infringing products. So that's appendix 7696 through 7697. And they had admitted they were actually doing that as to some products. They didn't deny that. And as a matter of fact, their witness's testimony was... Did they admit that they were doing that at the time of the consideration of this injunction request? Yes. In fact, at argument on that, they admitted at the present time they were doing that. And so that's the first thing. Isn't that a matter of calculation of damages? No. If the continuing action after... If we were to affirm what the district court decided, there were... And here, if you say there was admitted infringement after the verdict was rendered, that is a post-trial damages system? Yes, Your Honor. There is a post-trial damages system and we would need an accounting. The reason we were asking for an injunction, though, is our damages expert said, I can't get information from SKPI on how much is actually coming in because they denied any knowledge that it was coming in, even though the jury found ultimately it was. So what he said was, I've traced a very closed system from Korea into the United States. That amount I can confirm. The rest would be subject to having to go through machinations, including hopefully getting SKPI to come clean as to what that amount is. But in the interim, we couldn't assess those damages. So if you're asking me by now, maybe in accounting we can address them. But our expert specifically said, and this is where the irreparable harm comes, I'm only getting the tip of the iceberg. There's so much more that is coming in, but I can't give you a calculation with reasonable certainty because I can't get SKPI's numbers. So once you admit after that that you're continuing to deplete that inventory, but you won't come clean on the amount of it, you should be enjoined at least from that and then any colorable imitation. Because we had evidence, by the way, presented at trial, that they told their customers we are changing the name of the product, but the product was going to be the same. So we had some evidence that even this... But that wasn't being litigated, and they just recall whether the product is different or the same? Yeah, and that was our argument, that the product was just named something different. Is all of this available for all appropriate remedial relief in the proceeding currently before Judge Guilford, including the possibility of an injunction? Yes, yes, but it's... Yes, specifically it would cover the redesigned product again, but at this point we are going to have... We have to go forward on the continued sales of the inventory. So the answer is yes, but then the question, and this is why I ask it, doesn't it turn the law on its head? Because if you come in and say, I simply redesigned, are you just simply then to get the benefit of now saying, I won't be enjoined for my first malfeasance. I'll await the several years so I've delayed any potential of injunction. I've just freed myself by claiming a redesign. Doesn't the court still have to go through all the factors and say, you claim a redesign, but let's still see if the party is injured otherwise, especially by these continued sales, and let's go through all the factors. Why should we simply take the word that there's a redesign because you filed a new lawsuit? That's what turns the law on its head. Okay, let's hear from Mr. Jakes. Thank you. If I could answer a couple of questions on the comparative example. Right under comparative example, it says the TD shrinkage is zero. That means no SAG. That's the indication there. If you look at the rest of it though, it calls it a comparative polyamide film. All the other examples are referred to as the present invention. Then it goes on to say, the results couldn't be obtained with the comparative example. So what we have here is, the patent doesn't disclose any other way to achieve the results other than step D. Counsel has argued that it meets some of the claims. That does assume the answer. That assumes that step D is not required. So that really can't resolve it. And in fact, if you could meet, if you could make a film that meets the claim without step D, then the statements in the prosecution history are false. The statement that step D results in a materially different film, that the prior art wouldn't meet the properties without step D. It's basically saying, well, maybe they could or they couldn't. So those statements would no longer be true. The only way for there to be consistency is if the comparative example is outside the scope of the claims because it's unsatisfactory and does not meet step D. Okay, are we ready for the cross appeal? Yes, I'm happy to address that. Yes, Your Honor. I think it's a mistake to say that all we did was file a declaratory judgment action. We did have our expert test the films and show that they did not fall within the parameters. There's a dispute over that, but that's not the sort of thing that should be adjudicated on an injunction or a contempt proceeding. That should be determined as a new judgment of infringement. So it's not simply filing a declaratory judgment action. And so what happens in the interim? Which court decides whether at least a portion of the continuing importations were covered by the verdict? Yes, as to the redesigned films, that will be handled in the declaratory judgment action. Well, that hasn't been decided, so all right. That's right. As to the other films, the only evidence in the record was that sales within the closed Korean market stopped in August of 2016. The judgment was entered of May 2017. Conoco moved for an injunction in July 2017. I think Mr. Dane said that, at least at the oral argument on the injunction, you agreed that perhaps inadvertently, but nevertheless, some of the old products were still being sold right at that time. There is a possibility, yes. But what they were being sold for was for a different purpose, not for flexible copper-clad laminates in other countries. And so those inventories were continuing to be sold. At some point, they have stopped completely. Was there a concession that they were being sold in a way that you knew destined them for the U.S.? No, not at all. As to those units, not the redesigned ones, but the perhaps inadvertent old ones sold sometime after the jury verdict, maybe even at the time of the oral argument on the injunction, are those units and sales in front of Judge Guilford? I don't believe so. Those are only the redesigned films are. Those films, as I said, they stopped in August 2016, the sales within the closed Korean market. And they stopped for sales to any flexible copper laminate later that year. There's no evidence that those were sold beyond 2016. Well, there's no evidence that apparently is part of the problem, the difficulty of obtaining evidence. I'm just talking about sold anywhere for those purposes. I understood at the time of the argument. I think my question is very much like what Judge Newman asked. Is there, in fact, something falling through the cracks here? So the tracing of these things from your facilities, wherever they are, Korea, I guess, to the United States of the resulting product is apparently quite difficult. It is. So that means, which I think Mr. Dane said was one reason that you explained why it was very hard to chew up the damages, provide supplemental damages up to the time of judgment, because who knew where a lot of these came from? And yet, if those things hard to trace were in fact coming into the United States, the old products, presumably they were harmed by that. And yet you're saying there is no redress for that in front of Judge Guilford? No. Is there a redress somewhere? There's still supplemental damages after the time of the trial that has not been addressed yet for the same infringement that was proved at trial. That has not yet been determined. But at least what Mr. Dane suggested is that that would, in fact, be very hard to prove, which is one classic, maybe reason, maybe even the very best reason for enjoining the activity at some source because it's too darn hard to trace the resulting dollar damages. Yeah, I actually think that turns things around. Their difficulty in proving is because of the way this market is structured. If you look at what SKPI actually does, it sells to somebody that is four steps removed in the supply chain from the smartphones that come into this country. That's the reason it's difficult to prove, not because of anything that SKPI does. It's just because of this complicated chain. Except their injunction, even if it might have been too broad, but it would, among other things, I think they say, attach some sort of notice that these things may not come into the United States, at which point the recipients of the thing as it moves down five steps or more down the supply chain would have notice of that and decide what risks are worth taking. That's not necessary because on this record, it shows that we've stopped doing that. We've stopped selling to the companies in Korea that they were able to prove led to the products being imported in the US. That has stopped. So there is no injunction that is necessary. Trying to enjoin SKPI from selling to any country for any purpose on the possibility that it might eventually make it into the United States, that is way too broad. And that's an extraterritorial injunction. It's not. Did you agree that the 7696 is the proposed order granting entry of injunction? That's what it's titled. I believe that that was what they submitted, yes. Right. The language about selling is maybe not very precisely tied into the United States. But on the other hand, maybe it is. SKPI doesn't sell into the United States. It sells to what they were able to prove, this closed Korean market to two companies. Did the district court say in denying the request for an injunction, one reason is that the requested one is overbroad? I don't believe that was the reason. I think it focused on the redesigned films  were going to be in front of the other district court judge. And if the district court if that's not what they were trying to enjoin, then it shouldn't have been an issue. But obviously, they were trying to enjoin that. They were trying to capture the redesigned films. OK. Thank you. Thank you, Mr. Jakes. A couple of minutes of rebuttal on the cross appeal. If there's something you need to tell us. Your Honor, just briefly, they're overcomplicating the sale process. They were admitting they continued to sell the inventory. And that inventory we had traced into the United States. They're talking about the bigger picture of now with this redesigned process, they're claiming it doesn't have that same route. So that may go other places. We couldn't quantify it without an accounting. But at the time they admitted it, they admitted they were selling the inventory in the same process. And it was coming through. They wanted to deplete their inventory. And counsel was fairly I mean, he was he was I don't want to say honest because he's honest all the time. But he was direct in saying the judge did not rely on, you know, this might go elsewhere or redesign. He was specifically understanding it was still selling the infringing film that the jury had found. He was just pushing that to Judge Guilford because they'd filed a counterclaim. So there is something falling through the gap, clearly. Thank you, Your Honor. Thank you, Mr. Dan. Thank you both. The case is taken under submission.